**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IRMA CARRERA AGUALLO, DROR HERTZ, and KELVIN HOLMES, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KEMPER CORPORATION and INFINITY INSURANCE COMPANY,<br><br>Defendants. | Case No.:<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Irma Carrera Aguallo, Dror Hertz, and Kelvin Holmes ("Plaintiffs") bring this Class Action Complaint against Defendants Kemper Corporation ("Kemper"), and Infinity Insurance Company ("Infinity" and, collectively, "Defendants") as individuals and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Kemper and its wholly-owned subsidiary, Infinity, are insurance companies. Among other types of insurance, Defendants sell automobile insurance.

2. On or about March 16, 2021, Infinity began notifying customers and state Attorneys General about a data breach that occurred on December 26, 2020 (the "Data Breach").[1] Hackers obtained information from Kemper and its subsidiaries including personally identifiable information ("PII") of thousands of its current or former employees and customers, including, but

---

[1] https://www.doj.nh.gov/consumer/security-breaches/documents/infinity-insurance-20210317.pdf (last visited Apr. 7, 2021).

- 1 -

not limited to, their names, addresses, Social Security Numbers, driver's license numbers, medical leave information, and workers' compensation claim information. As Defendant Infinity explains on its website: "Personal data is information that identifies you: your name and surname, your picture, your address, your phone, etc. Your personal data tells your life story: who you are, where you live, what you do, what you like..."[2]

3.      Not only did hackers steal the PII of Plaintiffs and class members, but, upon information and belief, criminals have already used the PII to attempt to steal certain of Plaintiffs' and class members' identities. Hackers accessed and then either used or offered for sale the unencrypted, unredacted, stolen PII to criminals. This stolen PII has great value to hackers. Because of Defendants' Data Breach, customers' PII is still available and may be for sale on the dark web for criminals to access and abuse. Defendants' customers and employees face a lifetime risk of identity theft.

4.      As Defendant Infinity acknowledges on its own website:

The information they steal allows the modern thief to assume your identity when carrying out criminal acts such as:

- Using your credit history.

- Making financial transactions on your behalf, including opening credit accounts in your name.

- Impersonating you via mail and/or email.

- Impersonating you in cyber forums and social networks.

- Stealing benefits that belong to you.

- Committing illegal acts which, in turn, incriminate you.[3]

5.      Infinity also acknowledges that "[w]hen you discover that you've been a victim of

---

[2]      https://www.infinityauto.com/knowledge-center/daily-life-and-family/how-can-your-identity-be-stolen (last visited Apr. 5, 2021).

[3]      *Id*.

online fraud and identity theft, it can be a scary moment."[4]

6.      Plaintiffs' and class members' PII was compromised due to Defendants' negligent and/or careless acts and omissions and their failure to protect the PII.

7.      Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendants' failure to: (i) adequately protect its current or former employees' and customers' PII, (ii) warn them of their inadequate information security practices, and (iii) effectively monitor their websites and platforms for security vulnerabilities and incidents. Defendants' conduct amounts to negligence and violates federal and state statutes.

8.      Plaintiffs and similarly situated individuals have suffered injury as a result of Defendants' conduct.  These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) deprivation of rights they possess under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*. (the "UCL"); the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq*. (the "CCPA"); California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*. (the "CLRA"); and Florida's Deceptive and Unfair Trade Practices Act, Florida Statute § 501.203, *et seq*.; and (v) the continued and certainly an increased risk to their PII, which: (a) remains available on the dark web for individuals to access and abuse; and (b) remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII.

## **PARTIES**

9.      Plaintiff Irma Carrera Aguallo is a citizen of California, residing in the County of Los Angeles, California.  Ms. Aguallo received the Notice of Data Breach from Defendant Infinity dated March 16, 2021, on or about that date.

---

[4]      https://www.infinityauto.com/knowledge-center/daily-life-and-family/how-to-get-my-identity-back (last visited Apr. 7, 2021).

10.    Plaintiff Dror Hertz is a citizen of Florida, residing in Broward County, Florida. Mr. Hertz received the Notice of Data Breach from Defendant Infinity dated March 16, 2021, on or about that date.

11.    Plaintiff Kelvin Holmes is a citizen of Georgia residing in Polk County, Georgia. Mr. Holmes received the Notice of Data Breach from Defendant Infinity dated March 16, 2021, on or about that date.

12.    Defendant Kemper Corporation ("Kemper") is a Delaware corporation with its principal place of business at 200 E. Randolph St., Suite 3300, Chicago, Illinois, 60601.  Kemper offers insurance for home, auto, life, health, and valuables and has $14.1 billion in assets. According to its website, Kemper services approximately 6.4 million policies, employs over 9,300 "associates," is represented by more than 30,000 agents and brokers, and is licensed to sell insurance in all 50 states and the District of Columbia.[5]

13.    Defendant Infinity Insurance Company ("Infinity") is an Indiana corporation with its principal place of business at 2201 4th Avenue North, Birmingham, Alabama, 35203.  Infinity is a provider of auto insurance specializing in specialty or difficult-to-insure drivers. They have 2,300 employees and more than 10,000 independent agents. Writing about 1.5 billion premiums annually and generating $998.72 million in sales, the company is one of the largest nonstandard auto insurers in the nation. Infinity is a wholly-owned subsidiary of Kemper.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

15.    This Court has personal jurisdiction over Defendants because Defendant Kemper has its principal place of business within this District, and Defendant Infinity is a wholly-owned

---

[5]    https://www.kemper.com/wps/portal/Kemper/Home/AboutKemper (last visited Apr. 5, 2021).

subsidiary of Kemper.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District. Defendant Kemper resides within this judicial district and a substantial part of the events giving rise to the claims alleged herein occurred within this judicial district.

## FACTUAL ALLEGATIONS

**Background**

17. Defendant Kemper promises that it will protect its customers' privacy and remain in compliance with statutory privacy requirements. For example, Defendant Kemper states on its website:

> Kemper promises to keep your personal information safe and confidential. We never ask for information that we don't need, nor do we share your information with any other companies or organizations without your permission. We collect information from you for one reason only: to provide top-notch, on-demand services and accurate insurance quotes.[6]

18. Defendant Kemper also represents on its website: "We keep your information safeguarded and confidential;" "[w]e will share information about you ONLY AS PERMITTED BY LAW;" and "[w]e will NOT share your personal information with any other companies without your consent." [7] The types of information Kemper collects from its customers includes identifiers, personal records, consumer characteristics, commercial information, and professional or employment information, internet usage information and inferences from PII collected.[8]

19. Defendant Infinity similarly promises in its privacy policy: "[W]e will not share your personal information with other Kemper companies for marketing purposes except as allowed by applicable law." [9] Infinity also represents that it "take[s] reasonable steps to protect personal

---

[6]     https://customer.kemper.com/auto/privacy-policy (last visited Apr. 5, 2021).
[7]     *Id*.
[8]     *Id*.
[9]     https://www.infinityauto.com/privacy-policy (last visited Apr. 6, 2021).

information. These steps vary depending on the type of information we have. These steps include computer equipment and system safeguards and secured files and buildings."[10]  The types of information Infinity may collect from its customers includes:  name, home and business address, email address, telephone numbers, credit card number or other payment information, payment history, account details, "including personal information about you, another insured on your policy, or a beneficiary when applying for a policy or requesting service," "information about your insurance claims," "information about your driving record," "your social security number and driver's license number," "information about the cars you own, your marital status, your family members, and about the home you own."[11]

**The Data Breach**

20.      On or about March 16, 2021, Defendant Infinity notified an unknown number of individuals of a data security incident that occurred on December 26, 2020.

21.      Infinity mailed a Notice of Data Breach to certain of its current and former customers and/or employees that its security team "detected indications of a potential security incident on December 26, 2020," and "identified brief, unauthorized access to files on certain company servers in [its] network on two days in December 2020."[12]  The Infinity Notice apologized for the "inconvenience" and offered a "complementary one-year membership to Experian IdentityWorks[SM] credit monitoring service.  The Infinity Notice advised the recipients to "remain vigilant by reviewing your financial account statements for any unauthorized activity."

---

[10]      *Id*.

[11]      *Id*.  *See also* https://www.infinityauto.com/ccpa-notice (last visited Apr. 6, 2021) ("We collect the following categories of PI from Consumers which we share only with our service providers for our business and operational purposes:  identifiers (e.g., name, phone number, email address, IP address, social security number, driver's license number, credit card number); personal records (e.g., name, phone number, email address); consumer characteristics (e.g., age, gender, family status); customer account details; internet usage information (e.g., information regarding your interaction with our online services); geolocation data; professional or employment information (e.g., profession, employment history); and commercial information (e.g. personal property, purchasing or consuming history)."

[12]      https://www.doj.nh.gov/consumer/security-breaches/documents/infinity-insurance-20210317.pdf (last visited Apr. 7, 2021).

**The Value of PII to Hackers**

22.     Businesses that store personal information are likely to be targeted by cyber criminals. Credit card and bank account numbers are tempting targets for hackers. However, information such as dates of birth and Social Security numbers are even more attractive to hackers; they are not easily destroyed and can be easily used to perpetrate identity theft and other types of fraud.

23.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web.  Numerous sources cite dark web pricing for stolen identity credentials.  For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[13] Stolen credit or debit card numbers can sell for at least $150 on the dark web.[14] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[15]

24.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration ("SSA") stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone

---

[13]     *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs (last visited Apr. 7, 2021).

[14]     Zachary Ignoffo, *Dark Web Price Index 2021*, Privacy Affairs (March 8, 2021) (According to the Dark Web Price Index for 2021, payment card details for an account balance up to $1,000 have an average market value of $150, credit card details with an account balance up to $5,000 have an average market value of $240, stolen online banking logins with a minimum of $100 on the account have an average market value of $40, and stolen online banking logins with a minimum of $2,000 on the account have an average market value of $120).

[15]     *In the Dark*, VPNOverview, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark (last visited Mar. 7, 2021).

is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[16]

25.    What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

26.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[17]

27.    Furthermore, as the SSA warns:

Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

If you receive a new Social Security Number, you should not be able to use the old number anymore.

For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[18]

---

[16]    SSA, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Apr. 7, 2021).

[17]    Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft (last visited Apr. 7, 2021).

[18]    SSA, *Identity Theft and Your Social Security Number*, SSA Publication No. 05-10064 (Jun. 2018), http://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Apr. 7, 2021).

28.     Here, the unauthorized access by the hackers left the cyber criminals with the tools to perform the most thorough identity theft—they have obtained all the essential PII to mimic the identity of the user.  The personal data of Plaintiffs and members of the Classes stolen in the Data Breach constitutes a dream for hackers and a nightmare for Plaintiffs and the Classes.  Stolen personal data of Plaintiffs and members of the Classes represents essentially one-stop shopping for identity thieves.

29.     According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to resolve.[19]  Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank and finance fraud.[20]

30.     More recently the FTC has released its updated publication on protecting PII for businesses, which includes instructions on protecting PII, properly disposing of PII, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

31.     The FTC has, upon information and belief, brought enforcement actions against businesses for failing to protect PII. The FTC has done this by treating a failure to employ reasonable measures to protect against unauthorized access to PII as a violation of the FTC Act, 15 U.S.C. § 45.

32.     General policy reasons support such an approach. A person whose personal information has been compromised may not see any signs of identity theft for years.  According

---

[19]     *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (Apr. 2013), https://dss.mo.gov/cd/older-youth-program/files/taking-charge-what-to-do-if-identity-is-stolen.pdf (last visited Apr. 7, 2021).

[20]     *Id.*  The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

to the United States Government Accountability Office ("GAO") Report to Congressional Requesters:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[21]

33. Companies recognize that PII is a valuable asset. Indeed, PII is a valuable commodity. A "cyber black-market" exists in which criminals openly post stolen Social Security numbers and other PII on a number of Internet websites. The stolen personal data of Plaintiffs and members of the Classes has a high value on both legitimate and black markets.

34. Identity thieves may commit various types of crimes such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, and/or using the victim's information to obtain a fraudulent tax refund or fraudulent unemployment benefits. The United States government and privacy experts acknowledge that it may take years for identity theft to come to light and be detected.

35. As noted above, the disclosure of Social Security numbers in particular poses a significant risk. Criminals can, for example, use Social Security numbers to create false bank accounts or file fraudulent tax returns. Defendants' former and current customers and employees whose Social Security numbers have been compromised now face a real and imminent substantial risk of identity theft and other problems associated with the disclosure of their Social Security number and will need to monitor their credit and tax filings for an indefinite duration.

36. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change

---

[21] *See* https://www.gao.gov/assets/gao-07-737.pdf (June 2007) at 29 (last visited Apr. 7, 2021).

— Social Security number, driver's license number or government-issued identification number, name, and date of birth.

37.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[22]

38.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

39.    The PII of Plaintiffs and members of the Classes was taken by hackers to engage in identity theft or and or to sell it to others criminals who will purchase the PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

40.    At all relevant times, Defendants were aware of the risk of a data breach to their systems because such breaches have dominated the headlines in recent years.[23]   Indeed, data

---

[22]    Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-cards.html (last visited Apr. 7, 2021).

[23]    *See e.g.*, Kelly Tyko, *LabCorp data breach exposes information of 7.7 million consumers*, USATODAY (June 4, 2019), https://www.usatoday.com/story/money/2019/06/04/labcorp-data-breach-7-7-million-consumers-affected/1346264001/ (last visited Apr. 7, 2021); Marie C. Baca, *DoorDash data breach affects 4.5 million users*, WASHINGTON POST (Sept. 26, 2019), https://www.washingtonpost.com/ technology/2019/09/26/doordash-data-breach-affects-million-users/ (last visited Apr. 7, 2021); Emily Flitter and Karen Weise, *Capital One Data Breach Compromises Data of Over 100 Million*, NEW YORK TIMES (July 29, 2019), https://www.nytimes.com/2019/07/29/business/capital-one-data-breach-hacked.html (last visited Apr. 7, 2021); Seth Fiegerman, *Yahoo Says 500 Million Accounts Stolen*, CNN TECH (Sept. 23, 2016), http://money.cnn.com/2016/09/22/technology/yahoo-data-breach/ (last visited Apr. 7, 2021); Sara Ashley O'Brien, *Giant Equifax Data Breach: 143 Million People Could Be Affected*, CNN TECH (Sept. 8, 2017), https://money.cnn.com/2017/09/07/technology/business/equifax-breach/index.html (last visited Apr. 7, 2021); Jim Finkel and David Henry, *Saks, Lord & Taylor Hit By Payment Card Data Breach*, REUTERS (Apr. 3, 2018), https://www.reuters.com/article/legal-us-hudson-s-bay-databreach/saks-lord-taylor-hit-by-payment-card-data-breach-idUSKCN1H91W7 (last visited Apr. 7, 2021); Bill Hutchinson, *87 million Facebook Users To Find Out If Their Personal Data Was Breached*, ABC NEWS (Apr. 9, 2018), https://abcnews.go.com/US/87-million-facebook-users-find-personal-data-breached/story?id=54334187 (last visited Apr. 7, 2021).

breaches increased by 17% in 2019 from 2018.[24]  Defendants knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and members of the Classes, including Social Security numbers, driver's license or state identification numbers, and/or dates of birth, and of the foreseeable consequences that would occur if Defendants' data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and members of the Classes a result of a breach.

41.     Plaintiffs and members of the Classes now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Classes are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

42.     The injuries to Plaintiffs and members of the Classes were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Plaintiffs and members of the Classes.

**The Plaintiffs' Experiences**

*Plaintiff Irma Carrera Aguallo*

43.     Plaintiff Irma Carrera Aguallo has purchased automobile insurance through a Kemper insurance company since in or about August 2018.  Ms. Aguallo was required by Kemper to supply it with her PII, including but not limited to her full name, California driver's license number, vehicle identification number, car registration, address, and telephone number. She has paid Kemper using her debit card, including type and full number, CVV code, and debit card expiration date.

44.     Ms. Aguallo received the Notice of Data Breach from Defendant Infinity, dated March 16, 2021, on or about that date.  The Notice stated that the exposed PII included Ms. Aguallo's full name and driver's license number.

45.     As a result of receiving the Data Breach notice, Ms. Aguallo has spent time dealing

---

[24]     Meera Jagannathan, *Data breaches soared by 17% in 2019*, MARKETWATCH (Jan. 29, 2020), https://www.marketwatch.com/story/data-breaches-soared-by-17-in-2019-but-theres-some-good-news-too-2020-01-29 (last visited Apr. 7, 2021).

with the consequences of the breach, including confirming the legitimacy of the Data Breach, reviewing the information compromised by the breach, self-monitoring her accounts, exploring credit monitoring and identity theft insurance options, and signing up for the free credit monitoring service offered by Defendants.

46.     Ms. Aguallo is not aware of any other data breaches that could have resulted in the theft of her driver's license number. She is very careful about sharing her PII, and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

47.     Ms. Aguallo stores any and all documents containing her PII in a safe and secure digital location and destroys any documents she receives in the mail that contain any of her PII or that may contain any information that could otherwise be used to compromise her payment card accounts.  Moreover, she uses complex passwords for her online accounts for added security.

48.     Ms. Aguallo suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that Plaintiffs entrusted to Defendants for the purpose of purchasing Defendants' products and which was compromised in and as a result of the Data Breach.

49.     Ms. Aguallo also suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has serious concerns for the loss of her privacy.

50.     Ms. Aguallo has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of criminals.

51.     Ms. Aguallo has become worried about this theft of her PII and has a continuing interest in ensuring that Defendants protect and safeguard her PII, which remains in their possession, from future breaches.

### Plaintiff Dror Hertz

52.     Plaintiff Dror Hertz received the Notice of Data Breach from Defendant Infinity, dated March 16, 2021, on or about that date. The Notice informed him that Infinity lost a file containing, at least, his full name and Social Security number.

53.     As a result of receiving the Data Breach notice, Mr. Hertz has spent time dealing with the consequences of the breach, including confirming the legitimacy of the Data Breach, reviewing the account compromised by the breach, traveling to his bank to report the breach, self-monitoring his accounts, exploring credit monitoring and identity theft insurance options, and signing up for the free credit monitoring service offered by Defendants.

54.     Mr. Hertz has experienced a dramatic increase in the number of phishing emails he receives since early 2021.

55.     Mr. Hertz is not aware of any other data breaches that could have resulted in the theft of his Social Security number. He is very careful about sharing his PII, and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

56.     Mr. Hertz stores any and all documents containing his PII in a safe and secure digital location and destroys any documents he receives in the mail that contain any of his PII or that may contain any information that could otherwise be used to compromise his payment card accounts. Moreover, he periodically changes his passwords for his online accounts for added security.

57.     Mr. Hertz suffered actual injury in being forced to review phishing emails and in paying money to, or purchasing products from, Defendants during the Data Breach—expenditures which he would not have made had Defendants disclosed that they lacked computer systems and data security practices adequate to safeguard customers' PII from theft.

58.     Mr. Hertz suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiffs entrusted to Defendants for the purpose of purchasing Defendants' products and which was compromised in and as a result of the Data Breach.

59.     Further, a portion of the price Mr. Hertz paid for any services he purchased from Defendants, like all other revenue Defendants obtained from customers, was or should have been allocated by Defendants to adequately safeguard customers' PII, but it was not. Thus, Mr. Hertz and Class Members overpaid for Defendants' services and should be entitled to restitution for that

overpayment.

60.     Mr. Hertz also suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has serious concerns for the loss of his privacy.

61.     Mr. Hertz has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

62.     Mr. Hertz has become worried about this theft of his PII and has a continuing interest in ensuring that Defendants protect and safeguard his PII, which remains in their possession, from future breaches.

### Plaintiff Kelvin Holmes

63.     Plaintiff Kelvin Holmes has been a client of a Kemper insurance company for his automobile insurance since in or about September 2020. Mr. Holmes was required by Kemper to supply it with his PII, including his full name, Social Security number, addresses, driver's license number, vehicle identification number, automobile registration, and telephone number. He has paid Kemper using his debit card, including type and full number, CVV code, and debit card expiration date.

64.     Mr. Holmes received the Notice of Data Breach from Defendant Infinity, dated March 16, 2021, on or about that date. The Notice informed him that Infinity lost a file containing, at least, his full name and Social Security number.

65.     As a result of receiving the Data Breach notice, Mr. Holmes has spent time dealing with the consequences of the breach, including confirming the legitimacy of the Data Breach, reviewing the accounts compromised by the breach, contacting his bank, self-monitoring his accounts, exploring credit monitoring and identity theft insurance options, and signing up for the free credit monitoring service offered by Defendants.

66.     Mr. Holmes is not aware of any other data breaches that could have resulted in the theft of his Social Security number. He is very careful about sharing his PII, and has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

67. Mr. Holmes stores any and all documents containing his PII in a safe and secure digital location and destroys any documents he receives in the mail that contain any of his PII or that may contain any information that could otherwise be used to compromise his payment card accounts. Moreover, he diligently chooses unique usernames and passwords for his various online accounts, and periodically changes his passwords for added security.

68. Mr. Holmes suffered actual injury in paying money to, and purchasing products from, Defendants' website during the Data Breach—expenditures which he would not have made had Defendants disclosed that they lacked computer systems and data security practices adequate to safeguard customers' PII from theft.

69. Mr. Holmes suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiffs entrusted to Defendants for the purpose of purchasing Defendants' products and which was compromised in and as a result of the Data Breach.

70. Further, a portion of the price Mr. Holmes paid for the insurance he purchased from Defendants, like all other revenue Defendants obtained from customers, should have been allocated by Defendants to adequately safeguard customers' PII, but it was not. Thus, Mr. Holmes and Class Members overpaid for Defendants' services and should be entitled to restitution for that overpayment.

71. Mr. Holmes also suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has serious concerns for the loss of his privacy.

72. Mr. Holmes has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

73. Mr. Holmes has become worried about this theft of his PII and has a continuing interest in ensuring that Defendants protect and safeguard his PII, which remains in their possession, from future breaches.

## **CLASS ALLEGATIONS**

74.     Plaintiffs bring this nationwide class action pursuant to rules 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class:

> All natural persons residing in the United States whose PII was compromised in the Data Breach announced by Defendants on or about March 16, 2021 (the "Nationwide Class").

75.     The California Subclass is defined as follows:

> All natural persons residing in California whose PII was compromised in the Data Breach announced by Defendants on or about March 16, 2021 (the "California Subclass").

76.     The Florida Subclass is defined as follows:

> All natural persons residing in Florida whose PII was compromised in the Data Breach announced by Defendants on or about March 16, 2021 (the "Florida Subclass").

77.     The Georgia Subclass is defined as follows:

> All natural persons residing in Georgia whose PII was compromised in the Data Breach announced by Defendants on or about March 16, 2021 (the "Georgia Subclass").

78.     The California, Florida, and Georgia Subclasses, are collectively referred to herein as the "Statewide Subclasses," and together with the Nationwide Class are collectively referred to herein as the "Classes."

79.     Excluded from the Classes are all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out, and all judges assigned to hear any aspect of this litigation and their immediate family members.

80.     Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

81. **Numerosity**: The Classes are so numerous that joinder of all members is impracticable. Defendants have identified thousands of customers whose PII may have been improperly accessed in the Data Breach, and the Classes are apparently identifiable within Defendants' records.

82. **Commonality**: Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual members of the Classes. These include:

a. When Defendants actually learned of the Data Breach and whether their response was adequate;

b. Whether Defendants owed a duty to the Classes to exercise due care in collecting, storing, safeguarding and/or obtaining their PII;

c. Whether Defendants breached that duty;

d. Whether Defendants implemented and maintained reasonable security procedures and practices appropriate to the nature of storing the PII of Plaintiffs and members of the Classes;

e. Whether Defendants acted negligently in connection with the monitoring and/or protection of PII belonging to Plaintiffs and members of the Classes;

f. Whether Defendants knew or should have known that they did not employ reasonable measures to keep the PII of Plaintiffs and members of the Class secure and to prevent loss or misuse of that PII;

g. Whether Defendants have adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h. Whether Defendants caused Plaintiffs' and members of the Classes damage;

i. Whether Defendants violated the law by failing to promptly notify Plaintiffs and members of the Classes that their PII had been compromised;

j. Whether Plaintiffs and the other members of the Classes are entitled to credit monitoring and other monetary relief;

k. Whether Defendants violated California's Unfair Competition Law, Cal. Bus. & Prof.

Code § 17200, *et seq.* (the "UCL");

l.   Whether Defendants violated the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.* (the "CCPA");

m.  Whether Defendants violated California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* (the "CLRA"); and

n.   Whether Defendants violated Florida's Deceptive and Unfair Trade Practices Act, Florida Statute § 501.203, *et seq.*

83.  **Typicality**: Plaintiffs' claims are typical of those of the other members of the Classes because all had their PII compromised as a result of the Data Breach due to Defendants' misfeasance.

84.  **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiffs' Counsel are competent and experienced in litigating privacy-related class actions.

85.  **Superiority and Manageability**:  Under rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Classes is impracticable. Individual damages for any individual member of the Classes are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendants' misconduct would go unpunished.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.  There will be no difficulty in the management of this action as a class action.

86.  Class certification is also appropriate under Rule 23(a) and (b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Nationwide Class as a whole and as to each Subclass as a whole.

87.  Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would

advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a. Whether Defendants owed a legal duty to Plaintiffs and members of the Classes to exercise due care in collecting, storing, using, and safeguarding their PII;

    b. Whether Defendants breached a legal duty to Plaintiffs and the members of the Classes to exercise due care in collecting, storing, using, and safeguarding their PII;

    c. Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

    d. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

    e. Whether members of the Classes are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendants' wrongful conduct.

## FIRST CLAIM FOR RELIEF
### Negligence
### (On Behalf of Plaintiffs, the Nationwide Class, and the Statewide Subclasses Against All Defendants)

88. Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 87.

89. Defendants owed a duty to Plaintiffs and Nationwide Class members to exercise reasonable care in obtaining, using, and protecting their PII from unauthorized third parties.

90. The legal duties owed by Defendants to Plaintiffs and Nationwide Class members include, but are not limited to the following:

    a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII of Plaintiffs and Nationwide Class members in its possession;

b.  To protect PII of Plaintiffs and Nationwide Class members in its possession using reasonable and adequate security procedures that are compliant with industry-standard practices; and

c.  To implement processes to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiffs and Nationwide Class members of the Data Breach.

91.  Defendants' duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interested and enforced by the Federal Trade Commission, the unfair practices by companies such as Defendants of failing to use reasonable measures to protect PII.

92.  Various FTC publications and data security breach orders further form the basis of Defendants' duty. Plaintiffs and Nationwide Class members are consumers under the FTC Act. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by not complying with industry standards.

93.  Defendants breached their duties to Plaintiffs and Nationwide Class members. Defendants knew or should have known the risks of collecting and storing PII and the importance of maintaining secure systems, especially in light of the fact that data breaches have been surging since 2016.

94.  Defendants knew or should have known that their security practices did not adequately safeguard Plaintiffs' and the other Nationwide Class members' PII.

95.  Through Defendants' acts and omissions described in this Complaint, including Defendants' failure to provide adequate security and its failure to protect the PII of Plaintiffs and the Classes from being foreseeably captured, accessed, exfiltrated, stolen, disclosed, and misused, Defendants unlawfully breached their duty to use reasonable care to adequately protect and secure Plaintiffs' and Nationwide Class members' PII during the period it was within Defendants' possession and control.

- 21 -

96.     Defendants breached the duties they owe to Plaintiffs and Nationwide Class members in several ways, including:

      a.   Failing to implement adequate security systems, protocols, and practices sufficient to protect employees' and customers' PII and thereby creating a foreseeable risk of harm;

      b.   Failing to comply with the minimum industry data security standards during the period of the Data Breach;

      c.   Failing to act despite knowing or having reason to know that their systems were vulnerable to attack; and

      d.   Failing to timely and accurately disclose to customers and employees that their PII had been improperly acquired or accessed and was potentially available for sale to criminals on the dark web.

97.     Due to Defendants' conduct, Plaintiffs and Nationwide Class members are entitled to credit monitoring. Credit monitoring is reasonable here. The PII taken can be used for identity theft and other types of financial fraud against the Nationwide Class members.

98.     Some experts recommend that data breach victims obtain credit monitoring services for at least ten years following a data breach.[25] Annual subscriptions for credit monitoring plans range from approximately $219 to $358 per year.

99.     As a result of Defendants' negligence, Plaintiffs and Nationwide Class members suffered injuries that may include: (i) the lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, time spent

---

[25]    In the recent Equifax data breach, for example, Equifax agreed to free monitoring of victims' credit reports at all three major credit bureaus for four years, plus $1 million of identity theft insurance. For an additional six years, victims can opt for free monitoring by one credit bureau, Equifax. In addition, if a victim's child was a minor in May 2017, he or she is eligible for a total of 18 years of free credit monitoring under the same terms as for adults.

deleting phishing email messages and cancelling credit cards believed to be associated with the compromised account; (iv) the continued risk to their PII, which may remain for sale on the dark web and is in Defendants' possession and subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession; (v) future costs in terms of time, effort, and money that will be expended to prevent, monitor, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Nationwide Class members, including ongoing credit monitoring.

100. These injuries were reasonably foreseeable given the history of security breaches of this nature. The injury and harm that Plaintiffs and the other Nationwide Class members suffered was the direct and proximate result of Defendants' negligent conduct.

**SECOND CLAIM FOR RELIEF**
**Negligence Per Se**
**(On Behalf of Plaintiffs, the Nationwide Class, and the Statewide**
**Subclasses Against All Defendants)**

101. Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 87.

102. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant's, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

103. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of the Data Breach for companies of Defendants' magnitude, including, specifically, the immense damages that would result to Plaintiffs and Members of the Classes due to the valuable nature of the PII at issue in this case—including Social Security numbers.

104. Defendants' violations of Section 5 of the FTC Act constitute negligence per se.

105.    Plaintiffs and members of the Classes are within the class of persons that the FTC Act was intended to protect.

106.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Classes.

107.    As a direct and proximate result of Defendants' negligence per se, Plaintiffs and members Classes have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII of its current and former employees and customers in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and members of the Classes.

108.    Additionally, as a direct and proximate result of Defendants' negligence per se, Plaintiffs and members of the Classes have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession.

### THIRD CLAIM FOR RELIEF
**Violation of California's Unfair Competition Law
Cal. Bus. & Prof. Code § 17200, *et seq*.—Unlawful Business Practices
(On Behalf of Plaintiff Irma Carrera Aguallo and the California Subclass
Against Defendants Kemper and Infinity)**

109.    Plaintiff Irma Carrera Aguallo re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 87.

110.    Defendants Kemper and Infinity have violated Cal. Bus. and Prof. Code § 17200, *et seq*., by engaging in unlawful, unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code § 17200 with respect to the services provided to the Nationwide Class or, in the alternative, the California Class.

111.    Defendants Kemper and Infinity engaged in unlawful acts and practices with respect to the services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiffs' and Nationwide and California Class members' PII with knowledge that the information would not be adequately protected; and by storing Plaintiffs' and the Nationwide and California Class members' PII in an unsecure electronic environment in violation of California's data breach statute, Cal. Civ. Code § 1798.81.5, which requires Defendants to implement and maintain reasonable security procedures and practices to safeguard the PII of Plaintiffs and the Nationwide and California Class members.

112.    In addition, Defendants Kemper and Infinity engaged in unlawful acts and practices by failing to disclose the data breach to Nationwide and California Class members in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82. To date, Defendant has still not provided such information to Plaintiffs and the Nationwide and California Class members.

113.    As a direct and proximate result of Defendants' unlawful practices and acts, Plaintiffs and the Nationwide and California Class members were injured and lost money or property, including but not limited to the price received by Defendants for the services, the loss of

Nationwide and California Class members' legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as described above.

114. Defendants knew or should have known that its computer systems and data security practices were inadequate to safeguard Nationwide and California Class members' PII and that the risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Nationwide and California Class.

115. Nationwide and California Class members seek relief under Cal. Bus. & Prof. Code § 17200, et seq., including, but not limited to, restitution to Plaintiffs and Nationwide and California Class members of money or property that Defendants may have acquired by means of their unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Defendants because of their unlawful and unfair business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

<u>FOURTH CLAIM FOR RELIEF</u>
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200,** *et seq***.—Unfair Business Practices**
**(On Behalf of Plaintiff Irma Carrera Aguallo and the California Subclass Against Defendants Kemper and Infinity)**

116. Plaintiff Irma Carrera Aguallo re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 87.

117. Defendants Kemper and Infinity engaged in unfair acts and practices by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiffs' and the Nationwide and California Class members' PII with knowledge that the information would not be adequately protected; and by storing Plaintiffs' and Nationwide and California Class members' PII in an unsecure electronic environment. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Nationwide and California Class members. They were likely to deceive the public into believing their PII was securely stored, when it was not. The

harm these practices caused to Plaintiffs and the Nationwide and California Class members outweighed their utility, if any.

118.    Defendants Kemper and Infinity engaged in unfair acts and practices with respect to the provision of services by failing to take proper action following the data breach to enact adequate privacy and security measures and protect Nationwide and California Class members' PII from further unauthorized disclosure, release, data breaches, and theft. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Nationwide and California Class members. They were likely to deceive the public into believing their PII was securely stored, when it was not. The harm these practices caused to Plaintiffs and the Nationwide and California Class members outweighed their utility, if any.

119.    As a direct and proximate result of Kemper's and Infinity's acts of unfair practices, Plaintiffs and the Nationwide and California Class members were injured and lost money or property, including but not limited to the price received by Defendants for the services, the loss of Nationwide and California Class members' legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as described above.

120.    Defendants Kemper and Infinity knew or should have known that their computer systems and data security practices were inadequate to safeguard the Nationwide and California Class members' PII and that the risk of a data breach or theft was highly likely. Kemper's and Infinity's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Nationwide and California Classes.

121.    Nationwide and California Class members seek relief under Cal. Bus. & Prof. Code § 17200, *et seq.*, including, but not limited to, restitution to Plaintiffs and the Nationwide and California Class members of money or property that the Defendants Kemper and Infinity may have acquired by means of their unfair business practices, restitutionary disgorgement of all

profits accruing to Defendants Kemper and Infinity because of their unfair business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

### FIFTH CLAIM FOR RELIEF
**Violation of the California Consumer Privacy Act,**
**Cal. Civ. Code § 1798.100, *et seq*.**
**(On Behalf of Plaintiff Irma Carrera Aguallo and the California Subclass Against**
**Defendants Kemper and Infinity)**

122.     Plaintiff Irma Carrera Aguallo re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 87.

123.     Defendants Kemper and Infinity violated section 1798.150(a) of the California Consumer Privacy Act ("CCPA") by failing to prevent Plaintiff Aguallo's and California Subclass members' nonencrypted and nonredacted PII from unauthorized access and exfiltration, theft, or disclosure as a result of Defendants Kemper's and Infinity' violations of their duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the PII of Plaintiff Aguallo and California Subclass members.

124.     As a direct and proximate result of Defendants Kemper's and Infinity's acts, Plaintiff Aguallo's and the California Subclass members' PII was subjected to unauthorized access and exfiltration, theft, or disclosure through Kemper's computer systems and/or from the dark web, where hackers further disclosed Kemper's customers' PII.

125.     As a direct and proximate result of Defendants' acts, Plaintiff Aguallo and the California Subclass members were injured and lost money or property, including but not limited to the price received by Defendants for the services, the loss of California Subclass members' legally protected interest in the confidentiality and privacy of their PII, nominal damages, and additional losses as described above.

126.     Defendants Kemper and Infinity knew or should have known that their computer systems and data security practices were inadequate to safeguard California Subclass members' PII and that the risk of a data breach or theft was highly likely.  Defendants Kemper and Infinity

failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information of Plaintiff Aguallo and the California Subclass members.

127.    Defendant Kemper is a public company that is organized or operated for the profit or financial benefit of its shareholders, with $14.1 billion in assets.  Kemper's wholly-owned subsidiary, Infinity, collects consumers' PII as defined in Cal. Civ. Code § 1798.140.

128.    At this time, Plaintiff Aguallo and California Class members seek only actual pecuniary damages suffered as a result of Defendants Kemper's and Infinity's violations of the CCPA, injunctive and declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and any other relief the court deems proper.

129.    Concurrently with the filing of this Complaint, Plaintiff Aguallo is providing written notice to Defendants Kemper and Infinity identifying the specific provisions of this title she alleges they have violated.  If within 30 days of Plaintiff Aguallo's written notice to Defendants Kemper and Infinity they fail to "actually cure" their violations of Cal. Civ. Code § 1798.150(a) and provide "an express written statement that the violations have been cured and that no further violations shall occur," Plaintiff Aguallo will amend this complaint to also seek the greater of statutory damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident or actual damages, whichever is greater.  *See* Cal. Civ. Code § 1798.150(b).

<u>SIXTH CLAIM FOR RELIEF</u>
**Violation of California's Consumers Legal Remedies Act,**
**Cal. Civ. Code § 1750,** ***et seq.***
**(On Behalf of Plaintiff Irma Carrera Aguallo and the California Subclass Against**
**Defendants Kemper and Infinity)**

130.    Plaintiff Irma Carrera Aguallo re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 87.

131.    The CLRA was enacted to protect consumers against unfair and deceptive business practices. It extends to transactions that are intended to result, or which have resulted, in the sale

or lease of goods or services to consumers. Kemper's and Infinity's acts, omissions, representations and practices as described herein fall within the CLRA because the design, development, and marketing of Kemper's and Infinity's insurance services are intended to and did result in sales of insurance services.

132.    Plaintiffs Aguallo and the other California Subclass members are consumers within the meaning of Cal. Civ. Code §1761(d).

133.    Kemper's and Infinity's acts, omissions, misrepresentations, and practices were and are likely to deceive consumers. By omitting key information about the safety and security of the Network and deceptively representing that it adequately maintained such information, Kemper and Infinity violated the CLRA.  Kemper and Infinity had exclusive knowledge of undisclosed material facts, namely, that its Network was defective and/or unsecure, and withheld that knowledge from California Subclass members.

134.    Kemper's and Infinity's acts, omissions, misrepresentations, and practices alleged herein violated the following provisions of section 1770 the CLRA, which provides, in relevant part, that:

(a)    The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

(5)  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have . . . .

(7)  Representing that goods or services are of a particular standard, quality, or grade . . . if they are of another.

(9)  Advertising goods or services with intent not to sell them as advertised.\

(14)  Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.

(16)  Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

For purposes of the CLRA, omissions are actionable along with representations.

135.    Kemper and Infinity stored California Subclass members' PII on its network. Kemper and Infinity represented to California Subclass members that its network was secure and that their PII would remain private. Kemper engaged in deceptive acts and business practices by providing in its Privacy Policy: "We keep your information safeguarded and confidential;" "[w]e will share information about you ONLY AS PERMITTED BY LAW;" and "[w]e will NOT share your personal information with any other companies without your consent."[26]   Infinity also engaged in deceptive acts and business practices by providing in its Privacy Policy:  "[W]e will not share your personal information with other Kemper companies for marketing purposes except as allowed by applicable law;" and "[w]e take[s] reasonable steps to protect personal information. These steps vary depending on the type of information we have. These steps include computer equipment and system safeguards and secured files and buildings."[27]

136.    Kemper and Infinity knew or should have known that it did not employ reasonable measures that would have kept California Subclass members' PII secure and prevented the loss or misuse of their PII. For example, Kemper and Infinity failed to take reasonable steps to prevent the loss of PII through their servers through appropriate encryption and industry best practices.

137.    Kemper's and Infinity's deceptive acts and business practices induced California Subclass members to provide PII, including Social Security numbers and driver's license numbers, for the purchase of insurance services. But for these deceptive acts and business practices, California Subclass members would not have purchased insurance services, or would not have paid the prices they paid for the insurance services.

138.    Kemper's and Infinity's representations that it would secure and protect California Subclass members' PII in its possession were facts that reasonable persons could be expected to rely upon when deciding whether to purchase insurance services.

---

[26]      https://customer.kemper.com/auto/privacy-policy (last visited April 7, 2021).
[27]      https://www.infinityauto.com/privacy-policy (last visited Apr. 7, 2021).

139.    California Subclass members were harmed as the result of Kemper's and Infinity's violations of the CLRA, because their PII was compromised, placing them at a greater risk of identity theft; they lost the unencumbered use of their PII; and their PII was disclosed to third parties without their consent.

140.    California Subclass members suffered injury in fact and lost money or property as the result of Kemper's and Infinity's failure to secure their PII; the value of their PII was diminished as the result of Kemper's and Infinity's failure to secure their PII; and they have expended time and money to rectify or guard against further misuse of their PII..

141.    Kemper's and Infinity's conduct alleged herein was oppressive, fraudulent, and/or malicious, thereby justifying an award of punitive damages.

142.    As the result of Kemper's and Infinity's violation of the CLRA, Plaintiff Aguallo, on behalf of herself, California Subclass members, and the general public of the State of California, seek injunctive relief prohibiting Kemper and Infinity from continuing these unlawful practices pursuant to California Civil Code § 1782(a)(2), and such other equitable relief, including restitution, and a declaration that Kemper's and Infinity's conduct violated the CLRA.

143.    Pursuant to Cal. Civ. Code § 1782, on April 8, 2011, Plaintiff Aguallo mailed Kemper and Infinity notice in writing, via U.S. certified mail, of the particular violations of Cal. Civ. Code § 1770 of the CLRA and demanded that they rectify the actions described above by providing complete monetary relief, agreeing to be bound by Kemper's and Infinity's legal obligations and to give notice to all affected customers of their intent to do so. If Defendants Kemper and Infinity fail to respond to the letter within 30 days and to take the actions demanded to rectify their violations of the CLRA, Plaintiff Aguallo will amend this Complaint to seek damages and attorneys' fees as allowed by the CLRA.

**SEVENTH CLAIM FOR RELIEF**
**Violation of Florida's Deceptive and Unfair Trade**
**Practices Act, Florida Statute § 501.201,** *et seq.*
**(On Behalf of Plaintiff Dror Hertz and the Florida Subclass**
**Against Defendants Kemper and Infinity)**

144.    Plaintiff Dror Hertz re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 87.

145.    Plaintiff Hertz and the Florida Subclass Members are "consumers." Fla. Stat. § 501.203(7).

146.    Plaintiff Hertz and the Florida Subclass Members purchased products and services, which are "things of value," from Defendants Kemper and Infinity. These purchases were made primarily for personal, family, or household purposes. Fla. Stat. § 501.203(9).

147.    Defendants Kemper and Infinity engaged in the conduct alleged in this Complaint by advertising and entering into transactions intended to result, and which did result, in the sale of goods, services, and/or property to consumers, including Plaintiff Hertz and the Florida Subclass Members. Fla. Stat. § 501.203(8).

148.    Defendants Kemper and Infinity engaged in, and their acts and omissions affected, trade and commerce. Defendants' acts, practices, and omissions were done in the course of Defendants' business of advertising, marketing, offering to sell, and selling and/or renting goods and services throughout Florida and the United States. Fla. Stat. § 501.203(8).

149.    Defendants Kemper and Infinity, operating in Florida and elsewhere, engaged in deceptive, unfair, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1), including but not limited to the following:

> a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Hertz and Florida Subclass members' PII, which was a direct and proximate cause of the Data Breach;

> b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy

measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Florida Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Florida's data security statute, F.S.A. § 501.171(2), which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and Florida Subclass members' PII, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Florida Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Florida's data security statute, F.S.A. § 501.171(2);

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Florida Subclass members' PII; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Florida Subclass members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Florida's data security statute, F.S.A. § 501.171(2).

150. Kemper's and Infinity's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of their data security and ability to protect the confidentiality of consumers' PII.

151. Had Kemper and Infinity disclosed to Plaintiff Hertz and the Florida Subclass members that their data systems were not secure and, thus, vulnerable to attack, Kemper and Infinity would have been unable to continue in business and they would have been forced to

adopt reasonable data security measures and comply with the law. Instead, Kemper and Infinity received, maintained, and compiled Plaintiff Hertz's and Florida Subclass members' PII as part of the services Kemper and Infinity provided and for which Plaintiff Hertz and Florida Subclass members paid without advising Plaintiff Hertz and Florida Subclass members that Kemper's and Infinity's data security practices were insufficient to maintain the safety and confidentiality of Plaintiff Hertz's and Florida Subclass members' PII. Accordingly, Plaintiff Hertz and the Florida Subclass members acted reasonably in relying on Kemper's and Infinity's misrepresentations and omissions, the truth of which they could not have discovered.

152. As a direct and proximate result of Kemper's and Infinity's unconscionable, unfair, and deceptive acts and practices, Plaintiff Hertz and Florida Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and nonmonetary damages, including loss of the benefit of their bargain with Kemper and Infinity as they would not have paid Kemper and Infinity for goods and services or would have paid less for such goods and services but for Kemper's and Infinity's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; time and money spent cancelling and replacing passports; loss of value of their PII; and an increased, imminent risk of fraud and identity theft.

153. Plaintiff Hertz and Florida Subclass members seek all monetary and non-monetary relief allowed by law, including actual or nominal damages under Fla. Stat. § 501.21; declaratory and injunctive relief; reasonable attorneys' fees and costs, under Fla. Stat. § 501.2105(1); and any other relief that is just and proper.

## EIGHTH CLAIM FOR RELIEF
### Breach of Implied Contract
### (On Behalf of Plaintiffs, the Nationwide Class,
### and the Statewide Subclasses Against All Defendants)

154. Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 87.

155. When Plaintiffs and Nationwide Class members provided their PII to Defendants in exchange for Defendants' products, they entered into implied contracts with Defendants under which—and by mutual assent of the parties—Defendants agreed to take reasonable steps to protect their PII.

156. Defendants solicited and invited Plaintiffs and Nationwide Class members to provide their PII as part of Defendants' regular business practices and as essential to the sales transaction process for card payment transactions. This conduct thus created implied contracts between Plaintiffs and Nationwide Class members on one hand, and Defendants on the other hand. Plaintiffs and Nationwide Class embers accepted Defendants' offers by providing their PII to Defendants in connection with their purchases from Defendants.

157. When entering into these implied contracts, Plaintiffs and Nationwide Class members reasonably believed and expected that Defendants' data security practices complied with relevant laws, regulations, and industry standards.

158. Defendants' implied promise to safeguard Plaintiffs' and Nationwide Class members' PII is evidenced by a duty to protect and safeguard PII that Defendants required Plaintiffs and Nationwide Class members to provide as a condition of entering into consumer transactions with Defendants.

159. Plaintiffs and Nationwide Class members paid money to Defendants to purchase products or services from Defendants. Plaintiffs and Nationwide Class Members reasonably believed and expected that Defendants would use part of those funds to obtain adequate data security. Defendants failed to do so.

160. Plaintiffs and Nationwide Class members, on the one hand, and Defendants, on the other hand, mutually intended—as inferred from customers' continued use of Defendants' insurance services—that Defendants would adequately safeguard PII. Defendants failed to honor the parties' understanding of these contracts, causing injury to Plaintiffs and Nationwide Class members.

161. Plaintiffs and Nationwide Class members value data security and would not have provided their PII to Defendants in the absence of Defendants' implied promise to keep the PII reasonably secure.

162. Plaintiffs and Nationwide Class embers fully performed their obligations under their implied contracts with Defendants.

163. Defendants breached their implied contracts with Plaintiffs and Nationwide Class members by failing to implement reasonable data security measures and permitting the Data Breach to occur.

164. As a direct and proximate result of Defendants' breaches of the implied contracts, Plaintiffs and Nationwide Class members sustained damages as alleged herein.

165. Plaintiffs and Nationwide Class members are entitled to compensatory, consequential, and other damages suffered as a result of the Data Breach.

166. Plaintiffs and Nationwide Class members also are entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Nationwide Class members.

## NINTH CLAIM FOR RELIEF
### Declaratory Judgment
### (On Behalf of Plaintiffs, the Nationwide Class, and the Statewide Subclasses Against All Defendants)

167. Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 87.

168. Defendants owe duties of care to Plaintiffs and Nationwide Class members which require them to adequately secure their PII.

169. Defendants still possess Plaintiffs' and Nationwide Class members' PII.

170. Defendants do not specify in their *Notice of Data Breach* what steps they have taken to prevent this from occurring again.

171. Plaintiffs and Nationwide Class members are at risk of harm due to the exposure of their PII and Defendants' failure to address the security failings that lead to such exposure.

172. Plaintiffs, therefore, seek a declaration that (1) each of Defendants' existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect customers' personal information, and (2) to comply with their explicit or implicit contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

    a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

    b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

    c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

    d. Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

    e. Conducting regular database scanning and security checks;

f.   Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g.   Purchasing credit monitoring services for Plaintiffs and Nationwide Class members for a period of ten years; and

h.   Meaningfully educating Plaintiffs and Nationwide Class members about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

<u>**TENTH CLAIM FOR RELIEF**</u>
**Unjust Enrichment**
**(On Behalf of Plaintiffs, the Nationwide Class,**
**and the Statewide Subclasses Against All Defendants)**

173.   Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 87.

174.   Plaintiffs and Nationwide Class members conferred a monetary benefit upon Defendants in the form of monies paid for services available from Defendants.

175.   Defendants appreciated or had knowledge of the benefits conferred upon them by Plaintiffs and Nationwide Class members. Defendants also benefited from the receipt of Plaintiffs' and Nationwide Class members' PII, as Defendants used it to facilitate the transfer of information and payments between the parties.

176.   The monies that Plaintiffs and Nationwide Class members paid to Defendants for services were to be used by Defendants, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

177.   As a result of Defendants' conduct, Plaintiffs and Nationwide Class members suffered actual damages in an amount equal to the difference in value between the amount Plaintiffs and Nationwide Class members paid for their purchases with reasonable data privacy and security practices and procedures and the purchases they actually received with unreasonable data privacy and security practices and procedures.

178.    Under principals of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Nationwide Class members because Defendants failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiffs and Nationwide Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

179.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Nationwide Class members all unlawful or inequitable proceeds they received as a result of the conduct alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Nationwide Class members, request judgment against the Defendants and that the Court grant the following:

A.    An order certifying the Classes as defined herein, and appointing Plaintiffs and their counsel to represent the Classes;

B.    An order enjoining Defendants from engaging in the wrongful conduct alleged herein concerning disclosure and inadequate protection of the PII belonging to Plaintiffs and the members of the Classes;

C.    An order instructing Defendants to purchase or provide funds for credit monitoring services for Plaintiffs and all members of the Classes;

D.    An award of compensatory, statutory, nominal and punitive damages, in an amount to be determined at trial;

E.    An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

F.    An award of reasonable attorneys' fees, costs, and litigation expenses, as allowable by law; and

G.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.

Date: April 8, 2021                           Respectfully Submitted,

                                  By:     */s/ Carl Malmstrom*
                                          CARL MALMSTROM
                                          **WOLF HALDENSTEIN ADLER
                                            FREEMAN & HERZ LLC**
                                          111 W. Jackson Blvd., Suite 1700
                                          Chicago, IL 60604
                                          Telephone: (312) 984-0000
                                          Facsimile: (212) 545-4653
                                          malmstrom@whafh.com

                                          RACHELE R. BYRD
                                          **WOLF HALDENSTEIN ADLER
                                            FREEMAN & HERZ LLP**
                                          750 B Street, Suite 1820
                                          San Diego, CA 92101
                                          Telephone: (619) 239-4599
                                          Facsimile: (619) 234-4599
                                          byrd@whafh.com

                                          M. ANDERSON BERRY
                                          LESLIE GUILLON
                                          **CLAYEO C. ARNOLD,
                                          A PROFESSIONAL LAW CORP.**
                                          865 Howe Avenue
                                          Sacramento, CA 95825
                                          Telephone: (916) 777-7777
                                          Facsimile: (916) 924-1829
                                          aberry@justice4you.com
                                          lguillon@justice4you.com